Filed 2/26/24  Suh v. Pak CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GLEN SUH, Plaintiff and Appellant, v. UN MI PAK et al., Defendants and Respondents. | B320737 Los Angeles County Super. Ct. No. BC685235 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Affirmed.

David S. Kim & Associates, David S. Kim and Todd A. Fuson for Plaintiff and Appellant.

Mortenson Taggart Adams, Kevin A. Adams, Robert A. Schultz and Cassie L. Doutt for Defendants and Respondents.

———————————

Plaintiff Glen Suh[1] appeals from the trial court's judgment after a bench trial awarding him $1,320,288 in damages for lost profits but denying him $4,714,622 in damages for "reverse royalties" stemming from his purchase of an It's Boba Time franchise with an exclusive 10-mile territory. The court found defendants Un Mi Pak, Boba Time, Inc., Richard Jun aka Tae Hoon Jun, IBT Brothers, Inc., J&U Corp., and Wellbeing Time, Inc.[2] breached their contract with plaintiff by opening competing It's Boba Time franchises within the exclusive territory and denying plaintiff's right to the exclusive territory.

In denying plaintiff the reverse royalties he claimed he could have collected from defendants for allowing other stores to open within his exclusive territory, the court found: plaintiff had not established "the ability to operate additional franchises," or the "profitability of any additional franchises"; and plaintiff's expert witness's testimony about the viability of other stores within the territory was "too speculative and unsupported." Plaintiff argues (1) the agreement did not require that he be able to open other franchises, and (2) the court erred in failing to award any damages for the lost value of the exclusive territory,

---

[1]     Glen Suh formed plaintiff Best Boba Time, Inc. to purchase the business at issue. Best Boba Time assigned all its rights in the case to Glen Suh. The judgment thus was entered in favor of Glen Suh alone.

[2]     The trial court found each defendant was the alter ego of the other. We thus refer to defendants collectively regardless of who specifically signed the agreements at issue or which defendant owned the franchise versus the business plaintiff bought.

as the evidence supported the expert's reverse royalty valuation and defendants presented no alternate valuation. We affirm.

## BACKGROUND

Our statement of the facts focuses on the only issue on appeal: the court's exclusion of the $4,714,622 plaintiff claimed his lost exclusive territory rights were worth from the awarded damages. By way of background, we briefly discuss the facts relating to defendants' liability, which we primarily adopt from the court's statement of decision. We reserve discussion of some of the evidence on damages for our analysis below.

### 1. *Plaintiff's purchase of an It's Boba Time store*

Defendant Boba Time, Inc., founded by defendants Eunice Unmi Pak[3] and her husband Tae Yoon "Richard" Jun, is the franchisor of "It's Boba Time" (IBT) retail specialty beverage and snack stores. The shops typically sell boba teas, smoothies, shaved ice, coffee, and other snack and food items. Defendants J&U Corp., Wellbeing Time, Inc., and IBT Brothers, Inc. are affiliates of Boba Time. Pak is the owner and President of Boba Time and its affiliate companies. Jun is the Vice President of Boba Time and J&U Corp.

Pak and Jun purchased a business located on property owned by plaintiff's father John Suh—in the name of now defunct IBT Brothers—and reopened the business as an IBT store. The store was located in Koreatown at 6th and Kenmore and thus was known as the Kenmore store. John Suh told Jun he was interested in having plaintiff buy the Kenmore store if Jun ever wanted to sell.

---

[3] Plaintiff sued Pak as "Un Mi Pak," but at trial she stated her name was "Eunice Unmi Pak."

3

In 2014, after having operated the Kenmore store for about two years, Pak and Jun agreed to sell it. Plaintiff and his father negotiated the sale with Jun. Ultimately, plaintiff purchased the Kenmore store for $700,000—later reduced to $675,000—and paid a $25,000 franchise fee. The franchise term was for two 10-year periods.

The typed purchase agreement—prepared by plaintiff's father, who was a real estate broker—included a provision that read: "Seller can establish or build or open on 1 more business wihtin [*sic*] a 10 miles radius for which Buyer has the first right refusal [*sic*] to purchase that pertaining business." Jun altered the provision by interlineation. He wrote "2" over "1," circled "10 miles," and handwrote above the sentence, "Koreatown S[outh] Venice N[orth] Santa Monica W[est] Alvarado E[ast] Crenshaw." (Full capitals omitted.) The parties also apparently signed a franchise agreement.

The joint escrow instructions include the following instruction, "Covenant Not to Compete: As part of the consideration herein paid, the Seller and Buyer agree that Seller is allowed by Buyer to open only 2 new business after close of escrow within the boundary set as follows: East Crenshaw – West Alvarado & South Venice – North Santa Monica. The Buyer has the first right refusal to purchase that pertaining new 2 Business [*sic*]." (Full capitals omitted.) The parties understood that, if there were a conflict between the purchase agreement and the escrow instructions, the purchase agreement would control. The sale closed around November 2014.

For the first two years, plaintiff's sales at the Kenmore IBT store grew steadily, reaching a peak net profit of $111,000 in 2016, based on $977,980 in gross sales. In 2016 and 2017,

4

defendants began opening other IBT stores in Koreatown and elsewhere within the 10-mile radius of plaintiff's store. When plaintiff contacted Jun about the other stores, Jun denied that plaintiff had an exclusive territory. Plaintiff's profits began dropping in 2017 to the point where he had a loss in 2019. In January 2020, plaintiff was forced to sell the Kenmore store at a $300,000 loss and to give up his exclusive territory franchise rights.

## 2. *Plaintiff's lawsuit and trial*

Plaintiff and Best Boba Time, Inc. sued defendants in November 2017 and filed a first amended complaint in December 2019. Plaintiff pursued causes of action against defendants for breach of contract and fraud.[4] Plaintiff alleged defendants' refusal to acknowledge and to honor his exclusive territory caused him harm: their opening of IBT stores within the exclusive area caused him to lose profits and, ultimately, his store; and their refusal to honor the exclusive territory prevented plaintiff "from capitalizing on development of that area." At trial, defendants contended plaintiff's lost profits resulted from his own mismanagement and increasing third-party competition; they also denied plaintiff had a 10-mile exclusive territory.

The court tried the case over four days beginning on August 16, 2021. Plaintiff, Pak, and Jun, all testified, as did plaintiff's father, defendant's real estate expert, and plaintiff's damages expert. The parties also introduced exhibits that the

---

[4]    Plaintiff alleged several causes of action against defendants. He pursued only those for breach of contract and fraud after the court sustained defendants' demurrer with leave to amend as to other causes of action.

5

court received into evidence. At the close of testimony, the court ordered the parties to submit proposed findings of fact and conclusions of law. The court adopted plaintiff's proposed findings of fact for the most part, adding its credibility findings. The court revised by interlineation some of plaintiff's proposed conclusions of law as to his damages with which it disagreed. The court also struck plaintiff's proposed findings as to his fraud cause of action, finding the fraud allegations did "not differ from the conduct establishing the breach of contract." The court submitted the revised statement as its proposed statement of decision.

3.     ***The court's proposed findings and conclusions as to defendants' breach of the parties' agreement***

The court found defendants agreed—as part of plaintiff's purchase of the Kenmore store—to give plaintiff "the right to operate an exclusive territory and promise not to compete for ten years, with the option to renew for an additional ten[-]year period. Defendants were allowed to open two more franchises in the territory, with [p]laintiff having the right of first refusal as to the ownership/operation of those two stores." The parties disagreed about the scope of plaintiff's exclusive territory under the purchase agreement—whether it encompassed a 10-mile radius around the Kenmore store, or the defined Koreatown area.[5] After finding Jun's and Pak's testimony not credible, the court found the 10-mile radius was plaintiff's exclusive

---

[5]     Jun testified defendants did not agree to a 10-mile exclusive territory—plaintiff had only the right of first refusal to the two stores to be opened in the defined Koreatown area.

6

territory, and the Koreatown exception was inserted to allow defendants to open two more locations within that defined area.

The court found the undisputed evidence showed defendants breached the parties' contracts. The evidence established that, after plaintiff purchased the Kenmore store and 10-mile exclusive territory rights, defendants themselves had opened at least two more IBT franchises in Koreatown without first offering the stores to plaintiff. In addition to breaching their obligation to give plaintiff the right of first refusal, defendants breached the purchase agreement by allowing—by the time of trial—19 franchised stores[6] to open within plaintiff's 10-mile exclusive territory area. Finally, defendants committed an anticipatory breach of contract when Jun denied plaintiff had exclusive rights to the 10-mile area.

### 4. *Plaintiff's expert's opinion on damages*

Only plaintiff's expert Thomas Neches—a forensic accountant—testified about damages. He prepared a summary of his calculations, which the court admitted as exhibit 20. In forming his opinion, Neches reviewed plaintiff's and Boba Time's financial records, the relevant agreements, Boba Time's franchise disclosure documents, the complaint, and discovery responses.[7] Assuming liability, he concluded defendants' direct competition with plaintiff's Kenmore store caused plaintiff to lose profits of $1,320,288 over the 20-year term of the agreement.

---

[6]     Exhibit 19 showed there were 18, rather than 19, IBT stores open in the 10-mile exclusive territory at the time of trial.

[7]     Neches included some of the information on which he relied in exhibit 20.

7

Neches further testified—again, assuming plaintiff proved liability, which the court found he did—plaintiff also lost the value of his exclusive territory rights. Neches explained a franchisee like plaintiff, who had an exclusive area, could charge "what's called a reverse royalty to the franchisor" for each franchise allowed to open within the exclusive area during the term of the franchise agreement. The court clarified a reverse royalty generally was a smaller percentage of the royalty the franchisor collected from the other franchisees.[8]

Neches calculated this second area of damages first by determining a reasonable reverse royalty rate plaintiff could have charged the franchisor. He chose 1.75 percent— the midpoint of the 1.5 to 2.0 percent that was customary in the retail food and beverage industry, according to his research. He then estimated the number of IBT stores that would open within the 10-mile territory during the maximum term. He determined that, as of the date of trial (August 2021), about 18 IBT stores were operating within the 10-mile area—up from two competing stores open in 2017.[9] Based on that growth, and projections in Boba Time's franchise disclosure documents, he assumed "an additional two stores would have opened each

[8] The evidence showed Boba Time charged franchisees a five percent royalty fee and a two percent marketing fee on weekly gross sales.

[9] The court admitted as exhibit 19 a map of the 18 IBT stores open within the 10-mile area at that time. The exhibit included a list of the stores' addresses as well as the addresses of six franchises "coming soon." According to exhibit 20, in 2018 there were four stores open within the exclusive territory, eight stores open in 2019, and 12 stores open in 2020.

year beginning in 2022 . . . through 2034," the end of the agreement's maximum 20-year term. He thus assumed there would be 44 IBT stores operating within the 10-mile territory by 2034. Finally, Neches estimated each IBT store open in the territory would have annual revenues (gross sales) of $750,000. He determined that assumption was "conservative and reasonable" based on plaintiff's Kenmore store's gross sales of almost $978,000 in 2016 and over $792,000 in 2017.[10]

Based on the foregoing assumptions, Neches calculated plaintiff's anticipated lost reverse royalties by multiplying the combined gross revenues of the IBT stores open in the territory from 2017 through 2034 by 1.75 percent. For example, he assumed the two stores open in 2017 would have a combined annual revenue of $1,500,000, generating a reverse royalty of $26,250. The number of stores and their combined annual sales—and resulting total royalty—increased each year through 2034.[11] For 2034, when Neches assumed 44 stores were open in the area, the projected royalty—from $33,000,000 in assumed combined revenues—was $577,500. Beginning in 2021, Neches applied a 3.24 percent discount rate based on "the Moody BAA corporate bond yield, which [took] into account both the time value of money and the risk that these various operations

[10] According to exhibit 20, plaintiff's store's gross sales in 2015 were $812,410. In 2019, the store had $774,421 in gross sales but $48,868 in "[r]eturns and [a]llowances" for total gross revenues of $725,553.

[11] Neches assumed each IBT store open in 2020 and 2021 made $375,000, rather than $750,000, during those years to account for the COVID-19 pandemic.

9

would have continued." Neches calculated the present value of the cumulative lost reverse royalties to be $4,658,000. He added $56,602 in prejudgment interest on the royalties from 2017 through 2021 for a total of $4,714,602 due for lost reverse royalties.

## 5. *The court's conclusions as to plaintiff's damages*

Adopting the language of plaintiff's proposed statement of decision, the court accepted Neches's calculations reflected in exhibit 20—to which defendants did not object—"as correct." The court accepted plaintiff's description of Neches's opinion that plaintiff's Kenmore store lost profits of $1,320,288 over the 20-year franchise term due to defendants' direct competition in breach of the parties' contract.

The proposed statement of decision then discussed Neches's opinion of "the value of [p]laintiff's lost exclusive territory rights." After stating, "Neches testified his review of Boba Time's historical opening of franchises within the exclusive territory conservatively showed that two stores per year could be opened," the court added by interlineation: "The Court was not persuaded that plaintiff established the ability to operate additional franchises nor the purported profitability of any additional franchises." The proposed statement of decision went on to describe Neches's testimony that Suh's exclusive territory rights enabled him to charge a reverse royalty "on gross sales from newly opened franchises in the exclusive territory." The court added the following finding: "Mr. Neches, while competent to provide testimony on forensic accounting, the Court felt his opinion about the viability of other stores was too speculative and unsupported." The court then struck plaintiff's proposed findings concerning his loss of $4,714,622 in reverse royalties.

10

The court found plaintiff was entitled to judgment in his favor on his breach of contract cause of action in the sum of $1,320,288 —Neche's calculation of plaintiff's lost profits—plus postjudgment interest, costs, and fees.[12]

## 6. *Plaintiff's objections to the proposed statement of decision*

Plaintiff objected to the court's proposed statement of decision, as did defendants, under rule 3.590, subdivision (g) of the California Rules of Court. Relevant here, plaintiff argued the court "employed an incorrect standard" in determining plaintiff had not " 'established the ability to operate additional franchises nor the purported profitability of any additional franchises.' " Plaintiff argued his ability to operate additional franchises within the 10-mile exclusive territory was "irrelevant to the value of that territory," as nothing in the parties' agreements required plaintiff to own or operate additional IBT franchises within the exclusive area personally. Plaintiff asserted that, because his "own ability to operate additional stores within the exclusive territory [was] not a prerequisite or requirement to [p]laintiff's use of the exclusive territory, the proper standard for [determining damages] is what was the value of [p]laintiff's right to exclusive possession and use."

---

[12] The two statements the court added in this section of the proposed statement of decision overlapped with the original text, rendering parts of the court's text illegible. Defendants' counsel used a software program to remove the overlap, making the text legible, and reproduced the court's text in respondents' brief. Plaintiff does not dispute the accuracy of the text defendants reproduced.

11

Plaintiff asserted the ability to open new stores in the exclusive territory was undisputed as exhibit 19 showed 19 (really, 18) IBT stores were operating within the exclusive territory by the time of trial.  Plaintiff argued Neches's calculation of the reverse royalties plaintiff would have been able to collect from stores opened in the territory—set forth in exhibit 20—also was supported by the evidence and uncontradicted.  Plaintiff noted Neches "obtained the baseline figures (e.g., the historical gross sales) from the documents he reviewed, including Defendants' Franchise Disclosure Documents (Exh. 9–15)."[13]  Plaintiff further argued the exclusive territory had "inherent value for its ability to be franchised (almost like a subletting) to others."  Plaintiff asked the court to include damages for the value of the exclusive territory in the amount of $4,714,622.

7.    *Entry of judgment*

The court overruled plaintiff's (and defendants') objections, ordering its statement of decision was final.  The court filed its judgment on March 8, 2022, and plaintiff filed and served notice of entry of judgment on March 10, 2022.  Defendants filed a notice of appeal from the judgment on May 9, 2022, and plaintiff filed a timely cross-appeal on May 26, 2022.  (Cal. Rules of Court, rule 8.406(b).)  On June 6, 2022, the court added $31,238.90 in costs, $504,745 in attorney fees, and interest to the final judgment in favor of plaintiff.

On December 2, 2022, defendants asked this court to dismiss their appeal.  We dismissed defendants' appeal on

---

[13]    Of these exhibits, only exhibit 15—the franchise disclosure document dated April 2020—was received into evidence.

12

December 15, 2022.  Plaintiff's cross-appeal thus became the only appeal before the court.

**DISCUSSION**

**1.  S*tandards of review***

The parties dispute the applicable standard of review. Plaintiff contends our review is de novo because his appeal (1) presents a legal question—whether the court improperly read a requirement into the contract that plaintiff be able to operate additional franchises within his exclusive territory to benefit from it—and (2) requires us to review the application of law to the "undisputed" evidence of "the value of additional franchises." Defendants, on the other hand, contend plaintiff's appeal challenges the *amount* of damages awarded, and thus is subject to the substantial evidence standard of review.

In general, on appeal from a judgment based on a statement of decision following a court trial, we "review questions of law de novo and we review the trial court's findings of fact under the substantial evidence standard."  (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791–792; see also *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94 (*Marriage of Ciprari*) [" 'The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' "].)  In doing so, we resolve " ' "any conflict in the evidence or reasonable inferences to be drawn from the facts . . . in support of the determination of the trial court's decision." ' " (*Marriage of Ciprari*, at p. 94.)  We " ' "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving conflicts in support of the [findings].  [Citations.]" [Citation.]  We may not

13

reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' " (*Ibid.*) Nevertheless, "[a] party may avoid implied findings in favor of a judgment, and preserve perceived error in a statement of decision, by making specific objections to the statement of decision." (*Ibid.*)[14]

We thus consider de novo whether the court applied the appropriate legal standard in determining plaintiff's damages. (See, e.g., *Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [considering de novo a taxpayer's challenge to the validity of the assessor's valuation method].) The trial court's finding that plaintiff's evidence was insufficient to establish the reverse royalties he claimed he would have received had defendants honored his exclusive territory rights, however, is subject to the substantial evidence standard of review.

Plaintiff contends our review of the court's findings he challenges is de novo because the evidence was undisputed. We disagree. Although defendants did not present their own conflicting damages calculation, the court heard and evaluated the factual bases for Neches's opinion. Defendants' counsel also raised issues with it through cross-examination. "[I]t is settled that when conflicting inferences may be drawn from undisputed

---

[14] Here, plaintiff objected to the court's finding that he failed to establish he could operate additional franchises in the territory as irrelevant to—and applying an "incorrect standard" in— determining the value of his exclusive territory. He argued "the inherent value was testified to and monetized by expert Neches," directing the court to exhibits 19 and 20.

facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable." (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 913; see also *Husain v. California Pacific Bank* (2021) 61 Cal.App.5th 717, 732 [whether a question of fact is decided on conflicting or undisputed facts, that fact question decided against appellant "must be affirmed under the rule of conflicting inferences by which we must indulge all reasonable inferences" in favor of the respondent].) And, as here, " ' "[w]here [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence *or reasonable inferences to be drawn from the facts* will be resolved in support of the determination of the trial court decision." ' " (*Marriage of Ciprari, supra*, 32 Cal.App.5th at p. 94, italics added.)

Moreover, where an appeal turns on the appellant's failure of proof, as it does here, " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

## 2. *Plaintiff did not forfeit his appeal*

Defendants initially contend plaintiff forfeited his right to appeal because he did not move for a new trial on the issue of inadequate damages. Plaintiff contends no new trial motion was required because (1) he objected to the court's proposed statement

15

of decision, and (2) the court made a legal error in failing to award any damages for the lost value of his exclusive territory.

Defendants rely on *County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121 (*County*), where the court stated: "Failure to move for a new trial on the ground of excessive or inadequate damages precludes a challenge on appeal to the amount of damages if the challenge turns on the credibility of witnesses, conflicting evidence, or other factual questions. . . . [¶] 'When defendants *first challenge* the damage award on appeal, without a motion for new trial, they unnecessarily burden the appellate courts with issues which can and should be resolved at the trial level. . . .' [Citation.] The same is true when a plaintiff challenges a damage award on appeal on the ground of inadequacy." (*Ibid.*, italics added.) The court explained, "A trial court ruling on a new trial motion on the ground of excessive or inadequate damages must weigh the evidence and acts as an independent trier of fact. [Citations.] Thus, the trial court is in a far better position than the Court of Appeal to evaluate the amount of damages awarded in light of the evidence presented at trial." (*Ibid.*)

Here, as plaintiff argues, he does not simply challenge the court's findings as to the sufficiency of the evidence of his claimed damages for the loss of his exclusive territory rights. He also contends the court applied the wrong standard in assessing those damages. In any event, plaintiff timely filed specific objections to the court's proposed statement of decision, requested a hearing, and asked the court to review its statement of decision and amend it to include damages for the value of his exclusive territory. Plaintiff argued (1) the value of the exclusive territory was not dependent on Suh's ability or inability to operate stores

16

within the area, as the court had found, (2) the territory had inherent value for its ability to be franchised to others, and (3) Neches had given that value a figure that "was not effectively challenged or disputed by [d]efendants."

Plaintiff makes the same arguments on appeal—they are not new. (Cf. *County, supra*, 112 Cal.App.4th at p. 1122 [questions county presented on appeal about the value of real property "should have been presented to the trial court in a new trial motion"; plaintiff thus was precluded from arguing the issue for the first time on appeal].) We agree with plaintiff that his objections to the court's proposed statement of decision essentially served the same purpose as a motion for new trial: they made the trial court aware of the purported issues with its damages findings and directed it to the evidence plaintiff argued supported his contentions. A new trial motion would not have further elucidated the issue for the trial court. As the court evaluated the evidence of damages and acted as an independent trier of fact both at the trial and presumably in considering— and overruling—plaintiff's objections, plaintiff did not forfeit his appeal.

3. ***The court did not err in awarding plaintiff damages for his lost profits but not his lost, anticipated reverse royalties***

At trial, plaintiff argued defendants' wrongful conduct not only harmed his own IBT store by competing with it— for which the court awarded plaintiff his estimated lost profits— but also prevented him from capitalizing on reverse royalties or "upfront fees" he could have charged for each new IBT franchise that opened within the 10-mile area. He contends the court erred in failing to award any damages to account for the lost value of

17

his exclusive territory when the court found defendants breached the exclusive territory provision, and he presented "ample" uncontested and uncontradicted evidence of "the value of the exclusive territory."

a. *Applicable law*

Damages cannot be recovered for a breach of contract unless they are "clearly ascertainable in both their nature and origin." (Civ. Code, § 3301.) Thus, "[t]he plaintiff in a breach of contract action has the burden of proving nonspeculative damages with reasonable certainty." (*Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1, 11.) Generally, " 'damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774 (*Sargon*).) Such damages must be proven to be certain, " 'albeit not with "mathematical precision." ' " (*Id.* at p. 774.)

"Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses." (*Sargon, supra*, 55 Cal.4th at p. 774.) Where an established business's operation is prevented or interrupted, " 'damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' " (*Ibid.*) "On the other hand, lost anticipated profits for an unestablished business whose operation is prevented or interrupted are generally not recoverable because their occurrence is uncertain, contingent and speculative." (*Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th

18

281, 288; *Sargon*, at p. 774.)  Nevertheless, " 'anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' " (*Sargon*, at p. 774; see also *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883–884 (*Kids' Universe*) [" 'Lost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking.  But lost prospective net profits may be recovered if the evidence shows, with reasonable certainty, both their occurrence and extent.' "].)

    " 'The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no [wrongful conduct].  If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery.  [Citations.]  If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded.' " (*Kids' Universe, supra*, 95 Cal.App.4th at p. 883.)

    " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.  [Citations.]  The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.  [Citation.]  This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.'  [Citation.]"

19

(*Sargon, supra*, 55 Cal.4th at pp. 774–775.) " 'It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct. [Citations.]' . . . [A] plaintiff is 'not required to establish the amount of its damages with absolute precision, and [is] only obliged to demonstrate its loss with reasonable certainty. [Citation.]' " (*Kids' Universe, supra*, 95 Cal.App.4th at p. 884.) Thus, expert testimony alone is sufficient to establish " ' "an award of lost profits in the new business context *when* the expert opinion is supported by tangible evidence with a 'substantial and sufficient factual basis' rather than by mere 'speculation and hypothetical situations.' " ' " (*Id*. at p. 885, quoting *Kaech v. Lewis County PUD* (2001) 106 Wash.App. 260 [23 P.3d 529, 539], italics added.)

Plaintiff's claim of lost anticipated reverse royalties has elements of a claim for lost anticipated profits of both a new business and an existing business. Plaintiff had to demonstrate unknown third parties would and could have opened viable IBT stores in the 10-mile area, and nonparty franchisees were operating—and would continue to operate—their IBT stores, at the levels Neches assumed. Plaintiff did not have to account for expenses under this theory of damages, as in a lost profits analysis, however. Rather, plaintiff had to demonstrate with reasonable certainty the gross sales and viability of current and future IBT stores that he did not own or operate. We thus apply the above principles from cases involving lost profits, as the parties do, in determining whether the court erred in finding the evidence insufficient to establish plaintiff's claimed lost anticipated reverse royalties.

b.    *The court did not apply an incorrect standard*

Plaintiff essentially contends the trial court erred in finding he had to prove he could "open and operate additional [IBT] stores in the exclusive area," when the parties' contract imposed no such requirement on plaintiff's exclusive use of the area.  We do not read the court's statement as finding plaintiff was required to show he could open more stores in order to recover damages for the loss of his exclusive territory.  Rather, that was *one way* plaintiff could have benefited from his exclusive territory.  Indeed, plaintiff testified he "had plans to open additional stores within the ten-mile radius," *and* to sell locations if other franchisees wanted to open a store within the territory for a $125,000 fee.  Thus, as defendants put it, the "exclusive territory could only have value to [plaintiff] if he or someone else could have opened profitable businesses there— as demonstrated by [plaintiff's] testimony regarding expansion and his expert's testimony regarding capitalizing on reverse royalties or 'upfront fees.' "  In our view, the court simply found plaintiff presented no evidence that he could have capitalized on his exclusive territory rights by opening additional IBT franchises and thus was not entitled to compensation for his inability to do so based on defendants' breach.

Substantial evidence supported the trial court's finding that plaintiff failed to demonstrate he would have been able to open more IBT stores in the area to warrant damages on that basis.  Plaintiff testified he wanted to open other IBT franchises but presented no evidence of concrete plans to do so.  (See, e.g., *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 749, 763 [testimony of property's worth had it been developed according to intended "plans and specifications" did not, without

21

evidence plaintiff was an established business or had a "track record" of successful developments, "supply substantial evidence that the development [was] reasonably certain to be built, much less that it [was] reasonably certain to produce profits"].)

Plaintiff also testified he "was having a lot of issues with the IRS" by 2020. From this, the court could infer he was in no position to buy more franchises. In any event, plaintiff does not contend he personally would have been able to open additional IBT stores. Thus, the court did not err in finding plaintiff could not recover damages for stores he was unable to open in the territory.

c. *The court did not err in finding plaintiff failed to establish his lost, anticipated reverse royalties with sufficient certainty*

As plaintiff notes, the court found defendants breached the parties' contract "by opening additional stores throughout the 10-mile radius area." Jun admitted Boba Time opened three new stores within Koreatown in 2016 and 2017, although one store replaced a franchisor-owned store that had been open in the area before plaintiff bought the Kenmore store. The court specifically found exhibit 19 "showed [18] stores opened within the 10-mile exclusive territory" after plaintiff bought the Kenmore store. Thus, had defendants honored plaintiff's exclusive territory rights—and plaintiff retained his franchise—plaintiff could have charged defendants a reverse royalty on the gross sales of the franchised stores defendants had opened within the 10-mile area.

As it is undisputed defendants did not compensate plaintiff for the right to open additional IBT franchises within his exclusive territory, plaintiff demonstrated the fact of that loss

22

due to defendants' breach—at least with respect to franchises opened as of the time of trial. We are mindful that the amount of damages need not be calculated with " 'absolute certainty' " where the fact of damages is certain. (*Sargon, supra*, 55 Cal.4th at p. 774.) Nevertheless, plaintiff bore the burden of proving the extent of his damages with reasonable certainty. (*Ibid.*; *Kids' Universe, supra*, 95 Cal.App.4th at pp. 883–884.) We cannot conclude the evidence compelled the court to find plaintiff demonstrated a reasonable probability that he would have earned the reverse royalties he claimed. As we discuss, the court reasonably could find Neches's calculations were grounded in speculative and insufficiently supported factual bases.

Our analysis here is somewhat unique in that plaintiff's calculation of lost reverse royalties is dependent not only on the assumption that additional IBT franchises operated by unidentified individuals would open within the 10-mile territory at a rate of two per year from 2022 through 2034 but also that each IBT franchise—existing and prospective—would gross $750,000 in annual sales on average. We begin with plaintiff's projected, prospective lost reverse royalties from the time of trial through 2034, which are more akin to lost profits for an unestablished business.

First, the court specifically found that, while Neches was "competent to provide testimony on forensic accounting, . . . his opinion about the viability of other stores was too speculative and unsupported." The evidence supports the court's assessment; it certainly did not compel the court to find otherwise.

Neches was a forensic accountant. He was not an expert in the retail food and beverage industry. He based his assumption that the 10-mile territory could support the net addition of two

IBT franchises per year from 2022 through 2034 on the fact 18 stores existed in the territory in 2021—including two franchisor-owned stores—up from two stores in 2017.[15]  He did not testify that he did any research into the market's ability to sustain that number of IBT stores within the territory, however. Nor did he testify he researched the expected demand for boba beverage stores like IBT when assuming the territory could support the net addition of two stores per year over the next 13 years.  Rather, he simply "noted that many Boba Time stores were being opened in that area, which indicate[d] that the area . . . [could] support many other stores."

Plaintiff notes Neches also considered Boba Time's own projections from its franchise disclosure documents in concluding he reasonably could assume the territory would support the opening of two more stores each year.  Boba Time's franchise disclosure document dated April 2020 projected 12 new

---

[15]     Pak testified she—meaning Boba Time, the franchisor—owned two of the stores listed in exhibit 19.  Based on the record, the court could infer these were the two stores defendants could open in Koreatown under the parties' agreement.  Neches testified he included them in his lost royalty calculation, having assumed—as the court ultimately found—defendants did not give plaintiff the right of first refusal to open those shops himself, as required.  As plaintiff failed to demonstrate he would have been able to open those stores had defendants offered them to him, defendants' failure to do so did not damage plaintiff in this respect.  The two franchisor-owned stores thus should not have been included as ones from which plaintiff could extract a reverse royalty.  Neches testified that, had plaintiff rejected the stores after defendants gave him the right of first refusal, his lost reverse royalty calculation "would go down a few percent[age] [points]."

franchised outlets and three new "company-owned" outlets would open within California in the 2020 fiscal year.  Those projections were not specific to plaintiff's 10-mile territory, however.  Nothing in the record demonstrates Neches determined which of those stores were projected to open within the 10-mile area.  We can infer the court found those projections thus did not provide a reasonable basis for Neches's assumption.

The court also found plaintiff failed to demonstrate "the purported profitability of any additional franchises."  Plaintiff contends Neches's assumption that the added IBT stores would average $750,000 in annual gross sales through 2034 was reasonable because the figure was based on historic data from the Kenmore store's sales.  " 'In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions.' " (*Sargon, supra*, 55 Cal.4th at p. 774.)  We cannot conclude this is such a case.

Considering plaintiff's Kenmore store suffered a loss in 2019—when only eight IBT franchises were open within the 10-mile territory[16]—the court reasonably could infer other IBT franchises also would have a drop in sales if a greater number of IBT franchises were to open in the area.  Indeed, plaintiff proposed the court's findings in its statement of decision that "[p]laintiff's profits lowered beginning in 2017, which Mr. Neches noted was at the same time as [d]efendants' direct competition began," and "[d]efendants' direct competition led

---

[16] According to Neches's alternative damages calculation based on an exclusive territory limited to Koreatown, in 2019 three IBT stores were open in Koreatown, where the Kenmore store was located.

to further lowering of profits such that [p]laintiff actually had a loss in 2019." Yet, Neches never considered the effect the opening of additional IBT franchises in the area would have on each store's viability and profitability when assuming each new —and existing—franchise would gross $750,000 in annual sales continuously through 2034.

Indeed, defendants' counsel specifically asked Neches, albeit in the context of lost profits, "If another Boba Time store opened within a block of Kenmore Boba Time in 2018, wouldn't that affect the income of the Kenmore Boba Time?" Neches responded, "It might or might not. It would depend on the particular facts and circumstances of the two stores, which I haven't analyzed."

Nor did Neches consider whether or how similar food and beverage stores opened in the area would affect the sales of the assumed, increasing number of IBT outlets. On cross-examination, Neches testified he knew only the number of IBT stores operating in the exclusive 10-mile area, not the number of other, competing beverage stores.[17] When asked if other competing beverage stores would "have an effect on the Kenmore Boba Time store's revenue," Neches did not know.

Based on the foregoing, the court reasonably found Neches's assumptions as to the number of IBT stores that could open within the exclusive territory, and their projected revenues, did not have a sufficient factual basis to support his calculation of prospective lost reverse royalties.

We also conclude the court did not err in finding plaintiff did not present sufficient evidence to support the reverse

---

[17] Defendants' real estate expert prepared a map of other competing boba and beverage stores in the Koreatown area.

royalties he lost from the IBT stores that were open in plaintiff's exclusive territory at the time of trial. We cannot say the fact the Kenmore store had gross sales in excess of $750,000 compelled the court to find reasonable Neches's assumption that the other existing IBT franchises had gross annual sales of $750,000.

To be sure, calculating *the Kenmore store's* prospective lost profits based on its historical net profits was reasonable. (*Sargon, supra,* 55 Cal.4th at p. 774 [extent of lost profits for established business " 'may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales' "].) We cannot conclude, however, the record established Neches's extrapolation of the Kenmore store's gross sales—albeit at the low-end of the store's sales—onto *other* IBT franchises operated by third parties was a reasonable basis of computation to determine plaintiff's lost royalties from established stores.

As those stores were in business—and defendants were collecting royalties from them based on each store's weekly gross sales—actual sales data for the exhibit 19 stores existed. Yet, plaintiff relied on assumed sales rather than introducing evidence of those stores' actual gross sales. Nothing in the record shows plaintiff asked defendants for that data in discovery or served a third-party subpoena on any of the stores listed in exhibit 19. As actual data were available, the court was not required to accept Neches's assumption that the existing stores grossed annual sales of $750,000, or that they would continue to do so through 2034.

Given the issues with the factual bases behind the assumptions on which Neches relied, the court did not err in finding plaintiff failed to demonstrate with reasonable certainty

that he lost $4,714,622 in reverse royalties.  We thus affirm the judgment awarding plaintiff his lost profits, but not his claimed lost reverse royalties.

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.